FILED
2012 Jul-30  PM 03:16
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| **AMANDA SHEA CREWS,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| **vs.** | ) | Civil Action Number |
| | ) | **7:11-cv-2580-AKK** |
| **MICHAEL J. ASTRUE,** | ) | |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY** | ) | |
| **ADMINISTRATION,** | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Amanda Shea Crews ("Crews") brings this action pursuant to sections 205(g) and 1631(c)(3) of the Social Security Act ("the Act"), 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking review of the final adverse decision of the Commissioner of the Social Security Administration ("SSA").  Doc. 8.  This court finds that the Administrative Law Judge's ("ALJ") decision - which has become the decision of the Commissioner - is supported by substantial evidence. Therefore, for the reasons elaborated herein, the Court will **AFFIRM** the decision denying benefits.

## I.  Procedural History

Crews filed her application for Title II disability insurance benefits ("DIB") and Title XVI Supplemental Security Income ("SSI") on July 3, 2007, alleging a disability onset date of March 1, 2006, (R. 111, 115), which she later amended to June 11, 2006, (R. 36), due to back and neck pain, anxiety, depression, and migraines, (R. 42-44, 146).  After the SSA denied her applications on August 31, 2007, (R. 63-74), Crews requested and received a hearing on September 25, 2009, (R. 34-60).  At the time of the hearing, Crews was 31 years old, had a high school diploma, and one year of college.  (R. 38).  Her past relevant work included work as a van driver and data entry clerk.  (R. 55).  Crews had not engaged in substantial gainful activity since June 11, 2006.  (R. 20).

The ALJ denied Crews' claims on October 14, 2009, (R. 32), which became the final decision of the Commissioner when the Appeals Council refused to grant review on May 17, 2011, (R. 1-4).  Crews then filed this action on July 14, 2011, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  Doc. 1; doc. 8.

## II.  Standard of Review

The only issues before this court are whether the record contains substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the ALJ applied the

correct legal standards, *see Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988);

*Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Title 42 U.S.C. §§ 405(g)

and 1383(c) mandate that the Commissioner's "factual findings are conclusive if

supported by 'substantial evidence.'" *Martin v. Sullivan*, 894 F.2d 1520, 1529

(11th Cir. 1990). The district court may not reconsider the facts, reevaluate the

evidence, or substitute its judgment for that of the Commissioner; instead, it must

review the final decision as a whole and determine if the decision is "reasonable

and supported by substantial evidence." *See id.* (citing *Bloodsworth v. Heckler*,

703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a

preponderance of evidence; "[i]t is such relevant evidence as a reasonable person

would accept as adequate to support a conclusion." *Martin*, 849 F.2d at 1529

(quoting *Bloodsworth*, 703 F.2d at 1239) (other citations omitted). If supported by

substantial evidence, the court must affirm the Commissioner's factual findings

even if the preponderance of the evidence is against the Commissioner's findings.

*See Martin*, 894 F.2d at 1529. While the court acknowledges that judicial review

of the ALJ's findings is limited in scope, it notes that the review "does not yield

automatic affirmance." *Lamb*, 847 F.2d at 701.

### III.  Statutory and Regulatory Framework

To qualify for disability benefits, a claimant must show "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 416(i).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrated by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

Determination of disability under the Act requires a five step analysis. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f).  Specifically, the Commissioner must determine in sequence:

(1)    whether the claimant is currently unemployed;

(2)    whether the claimant has a severe impairment;

(3)    whether the impairment meets or equals one listed by the Secretary;

(4)    whether the claimant is unable to perform his or her past work; and

(5)    whether the claimant is unable to perform any work in the national economy.

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).  "An affirmative

answer to any of the above questions leads either to the next question, or, on steps

three and five, to a finding of disability.  A negative answer to any question, other

than step three, leads to a determination of 'not disabled.'"  *Id*. at 1030 (citing 20

C.F.R. § 416.920(a)-(f)).  "Once a finding is made that a claimant cannot return to

prior work the burden shifts to the Secretary to show other work the claimant can

do." *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995) (citation omitted).

Lastly, where, as here, Crews alleges disability because of pain, she must

meet additional criteria.  In this circuit, "a three part 'pain standard' [is applied]

when a claimant seeks to establish disability through his or her own testimony of

pain or other subjective symptoms." *Holt v. Barnhart*, 921 F.2d 1221, 1223 (11th

Cir. 1991).  Specifically,

> The pain standard requires (1) evidence of an underlying medical
> condition and either (2) objective medical evidence that confirms the
> severity of the alleged pain arising from that condition or (3) that the
> objectively determined medical condition is of such a severity that it
> can be reasonably expected to give rise to the alleged pain.[1]

*Id*.  However, medical evidence of pain itself, or of its intensity, is not required:

> While both the regulations and the *Hand* standard require objective
> medical evidence of a condition that could reasonably be expected to
> cause the pain alleged, neither requires objective proof of the pain
> itself.  Thus under both the regulations and the first (objectively

---

[1] This standard is referred to as the *Hand* standard, named after *Hand v. Heckler*, 761
F.2d 1545, 1548 (11th Cir. 1985).

identifiable condition) and third (reasonably expected to cause pain alleged) parts of the *Hand* standard <u>a claimant who can show that his condition could reasonably be expected to give rise to the pain he alleges has established a claim of disability and is not required to produce additional, objective proof of the pain itself</u>. *See* 20 CFR §§ 404.1529 and 416.929; *Hale* at 1011.

*Elam v. R.R. Ret. Bd.*, 921 F.2d 1210, 1215 (11th Cir. 1991) (parenthetical information omitted) (emphasis added). Moreover, "[a] claimant's subjective testimony supported by medical evidence that satisfies the pain standard is itself sufficient to support a finding of disability." *Holt*, 921 F.2d at 1223. Therefore, if a claimant testifies to disabling pain and satisfies the three part pain standard, the ALJ must find her disabled unless the ALJ properly discredits her testimony.

Furthermore, when the ALJ fails to credit a claimant's pain testimony, the ALJ must articulate reasons for that decision:

It is established in this circuit that if the [ALJ] fails to articulate reasons for refusing to credit a claimant's subjective pain testimony, then the [ALJ], as a matter of law, has accepted that testimony as true. Implicit in this rule is the requirement that such articulation of reasons by the [ALJ] be supported by substantial evidence.

*Hale v. Bowen*, 831 F.2d 1007, 1012 (11th Cir. 1987). Therefore, if the ALJ either fails to articulate reasons for refusing to credit the plaintiff's pain testimony, or if the ALJ's reasons are not supported by substantial evidence, the court must accept as true the pain testimony of the plaintiff and render a finding of disability. *Id*.

## IV.  The ALJ's Decision

The court turns now to the ALJ's decision to ascertain whether Crews is correct that the ALJ committed reversible error.  In that regard, the court notes that, performing the five step analysis, the ALJ initially determined that Crews had not engaged in substantial gainful activity since her alleged onset date, and therefore met Step One.  (R. 20).  Next, the ALJ found that Crews suffered from the following severe impairments: degenerative cervical disc disease status post anterior cervical diskectomy and fusion of C5-6 and C6-7, depressive disorder, anxiety disorder, polysubstance dependence, hypertension, and migraines.  *Id.* The ALJ then proceeded to the next step and found that Crews failed to satisfy Step Three because she "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments."  *Id.* Although the ALJ answered Step Three in the negative, consistent with the law, *see McDaniel*, 800 F.2d at 1030, the ALJ proceeded to Step Four, where she determined that:

> [Crews] has the residual functional capacity ["RFC"] to perform light
> work . . . , but with limitations.  In an 8-hour workday, [Crews] can
> stand, walk and sit 6 hours with normal breaks; she can lift and/or
> carry 20 pounds occasionally and 10 pounds frequently; she can push
> and/or pull 20 pounds occasionally and 10 pounds frequently; she can
> never climb ropes, ladders or scaffolds and she should never crawl;
> she can frequently reach in any direction; she can handle, finger and

feel with normal limits; she should have only occasional exposure to vibrating objects or surfaces; she must never work in high, exposed places; and she can understand, remember and carry out simple instructions continuously as well as make simple work-related decisions and respond appropriately to supervision continuously; she can handle changes in the routine work setting appropriately continuously; and she can respond appropriately to co-workers and to usual work situations frequently.

(R. 22).  Moreover, in light of Crews' RFC, the ALJ held that Crews is "capable of performing past relevant work as a Data Entry Clerk[.]"  (R. 32).  Ultimately, the ALJ found Crews "has not been under a disability, as defined in the Social Security Act, from June 11, 2006, through the date of this decision."  *Id.  See also McDaniel*, 800 F.2d at 1030.

## V.  Analysis

Crews contends the ALJ committed reversible error because the ALJ's RFC findings are not based on substantial evidence and the ALJ failed to make adequate findings of disability prior to applying the materiality test applicable to substance abuse.  Doc. 8 at 5-10.  The court addresses each contention below.

## A.  The ALJ's RFC Findings are Based on Substantial Evidence

### 1.  The ALJ's RFC finding Is Not Inconsistent with Crews' Ability to Perform Past Relevant Work

Crews' first contention is that the ALJ erred by finding that she can perform her past relevant work as a data entry clerk because the finding is inconsistent with

the RFC finding.  Doc. 8 at 5.  Specifically, Crews contends that "[t]he ALJ's

mental RFC findings are inconsistent with an ability to perform past semiskilled

work . . . . [and that] [a]n ability to understand, remember and carry out simple

instructions as well as make only simple work related decisions as found by the

ALJ does not generally indicate an ability to perform greater than 1-2 step

instructions with unskilled work."  *Id*.  The court disagrees.  As the Commissioner

pointed out, "a limitation to simple instructions and simple work-related decisions

does not equate with a limitation to unskilled work."  Doc. 11 at 12.  After all,

unskilled work is "work which needs little or no judgment to do simple duties that

can be learned on the job in a short period of time . . . and a person can usually

learn to do the job in 30 days."  20 C.F.R. § 404.1568(a).  In contrast, semiskilled

work is "work which needs some skills but does not require doing the more

complex work duties."  20 C.F.R. § 404.1568(b).  Here, as it relates to Crews'

mental RFC, the ALJ found that Crews "can understand, remember and carry out

simple instructions continuously as well as make simple work-related decisions

and respond appropriately to supervision continuously; she can handle changes in

the routine work setting appropriately continuously; and she can respond

appropriately to co-workers and to usual work situations frequently."  (R. 22).

Therefore, the ALJ's RFC finding is consistent with semi-skilled work because the

ALJ expects Crews to quickly handle changes in the routine work setting and to make simple work-related decisions.

Significantly, the ALJ obtained testimony from the VE to determine whether Crews can perform her past relevant work.  (R. 54).  The VE testified that a data entry clerk as described in the Dictionary of Occupational Titles ("DOT") is considered "semi-skilled . . .[but, the VE] would rate the job as being light as performed and described by [Crews] . . . ."  (R. 54).  Thereafter, the ALJ presented the VE with a hypothetical of an individual with Crews' age and education and that as a "consequence of the episodic migraine, the depressive elements and the anxiety disorder . . . [her] work-related activities would be intact except that her ability to respond appropriately to coworkers would be limited to frequently, and her ability to respond appropriately to usual work situations would be frequently, meaning from one-third to two-thirds of the work day but not in excess of that." (R. 55).  When asked if such an individual could perform work as a data entry clerk, the VE stated yes.  (R. 56).  Accordingly, the ALJ's finding that Crews can perform work as a data entry clerk, a semi-skilled position, is supported by substantial evidence, including the ALJ's RFC finding.

### 2.    The AJL Did Not Err In Concluding that Crews Complaints of Pain Were Not Credible.

As it relates to Crews' contention of disabling pain, the ALJ found that Crews' "medically determinable impairments could reasonably be expected to cause the alleged symptoms."  (R. 32).  However, the ALJ found also that Crews' "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the . . . [RFC] assessment."  *Id*.  The ALJ added further that "in evaluating [Crews'] [RFC], I have taken into consideration [Crews'] documented drug abuse and find that some of her complaints of pain are associated with her underlying addiction to opioid analgesics."  *Id*.  Crews contends that the ALJ erred "with the conclusion that much of [Crew's] treatment for her professed neck and back pain is the result of her drug seeking behavior rather than a genuine attempt to obtain relief from her symptoms."  Doc. 8 at 6.  Specifically, Crews states that the "medical evidence of record documents a credible record of complaints of pain with objective findings, and treatment commensurate with significant pain including narcotic medication and epidural blocks."  *Id*.  The court finds no error in the ALJ's analysis.

As a threshold matter, the court notes that subjective complaints of pain alone are insufficient to prove disability.  *See* 20 C.F.R. § 416.929(a); *see also*

*Holt*, 921 F.2d at 1223.  Rather, the pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.  *Id*.  It is undisputed that Crews has underlying medical conditions and, in fact, the ALJ found as such in Step Two.  The disagreement centers on whether Crews' conditions can reasonably be expected to cause the alleged pain.  Unfortunately for Crews, as shown below, a review of the ALJ's opinion and the medical evidence shows that the ALJ considered the pain documented in Crews' medical records and properly concluded that Crews' complaints of pain were not credible.

The relevant medical history begins on May 31, 2006, when Crews visited DCH Regional Medical Center ("DCH") complaining of left-sided neck pain.  (R. 200).  On June 1, 2006, Crews returned to DCH and underwent a MRI of her cervical spine, which showed the cervical vertebra to be in anatomic alignment and the cervical cord appeared normal in caliber and signal intensity.  *Id*. However, the MRI revealed Crews had "[d]isc pathology, primarily at C5-6, C6-7 which is asymmetric to the left, with large disc protrusion at C6-7 which likely impinges the existing C7 nerve root."  *Id*.  A physician at DCH prescribed Crews

medication to help with the pain.  *Id.*

On July 17, 2006, Crews visited Dr. Chester Boston ("Dr. Boston") for an evaluation of her neck.  (R. 261).  Dr. Boston noted that Crews was taking Vicoprofen for pain relief and Medrol Dosepak for inflammation.  *Id*.  Dr. Boston reviewed the DCH MRI and found that the disc herniation at C6-7 is consistent with Crews' symptoms and scheduled Crews for a cervical epidural block.  *Id*. Notably, Dr. Boston found Crews' x-rays unremarkable and noted that Crews appeared well developed and had no instability, tenderness, or abnormalities.  *Id*. Dr. Boston prescribed Vicoprofen and Flexeril.  *Id*.

On October 20, 2006, Crews returned to Dr. Boston for a follow-up visit. (R. 263).  Dr. Boston noted that the cervical epidural block provided Crews some relief, but that Crews failed to attend physical therapy due to lack of insurance coverage.  *Id*.  Crews had a normal physical examination, received a prescription for Ultram to relieve her pain, and Dr. Boston scheduled another cervical epidural block.  *Id*.  The next month, Dr. Boston recommended that Crews receive an anterior cervical diskectomy and fusion ("ACDF"), which Crews underwent on December 7, 2006.  (R. 265, 281-85).  Crews visited Dr. Boston on December 15, 2006, for a follow-up where he noted that the x-rays showed "the plate in good position and alignment with the interbody grafts in good position and alignment."

(R. 268).  Moreover, Dr. Boston stated that Crews' "range of motion does not demonstrate any associated pain, crepitation, or contracture. The joint is stable and does not demonstrate dislocation, subluxation or laxity." *Id.*

On March 20, 2007, DCH emergency department treated Crews for assault related facial swelling and headaches.  (R. 184).  During the exam, Crews relayed that she was "made to take cocaine" that same day.  (R. 184).  A month later, on April 22, 2007, and April 30, 2007, Crews visited the Northport Medical Center ("Northport") complaining of a migraine. (R. 208, 220).  On both visits, Crews appeared in no apparent distress, was stable, and received narcotic medication.  *Id*.

Thereafter, Crews visited Dr. Boston on May 9, 2007, alleging discomfort in her neck due to the March assault.  (R. 269).  Crews' evaluation appeared normal and the x-rays showed that the plate and interbody grafts were in a good position and alignment.  *Id*.  Dr. Boston suggested physical therapy again and prescribed Robaxin for pain.  *Id*.  Crews returned a month later, on June 6, 2007, during which Dr. Boston stated that Crews "symptoms continue to be noted in the trapezial region more on the left than on the right."  (R. 270).  However, again, Crews had a normal physical examination and the x-rays still demonstrated that the plate and interbody grafts were in good position and alignment.  *Id*.  Weeks later, on June 22, 2007, Dr. Boston administered another MRI and noted that the

MRI did not "demonstrate any other evidence of objective finding." (R. 271). As

a result, Dr. Boston scheduled Crews for another epidural block and prescribed

Darvocet and Flexeril for pain. *Id*. A month later, on July 18, 2007, Crews

expressed to Dr. Boston that her neck discomfort seemed to move from side-to-

side and that the Darvocet proved inadequate for her pain. (R. 273). However,

Crews' physical exam only revealed mild restrictions in cervical motion. *Id*.

Accordingly, Dr. Boston referred Crews to a pain specialist. *Id.*

Before visiting the pain specialist, Crews sought treatment first on August

16 and 26, 2007, at the Northport emergency department for migraines and

received narcotic medication. (R. 460, 468). On September 11, 2007, Crews

visited Dr. Frederick Graham ("Dr. Graham") for treatment because the pain

specialist Dr. Boston referred her to was not taking new patients.   (R. 576).

Crews complained to Dr. Graham of pain in her neck and shoulders and

headaches. *Id*. Dr. Graham noted that Crews appeared "well developed and

nourished . . . walks and stands normally, without limp or instability." *Id*. Dr.

Graham recommended that Crews use moist heat therapy on her neck and

prescribed Lortab. *Id.* Dr. Graham examined Crews again in October and

December 2007 and January and March 2008, for neck and arm pain. (R. 321-29).

Over the course of the visits, although Crews' physical examinations appeared

normal, Dr. Graham recommended a transforaminal epidural (which Crews failed

to show up for) and prescribed additional medication.  *Id*; (R. 580).  Moreover, an

MRI Dr. Graham obtained on January 8, 2008, showed moderate left foraminal

narrowing at C6-7 and fusion at Crews' C5 through C7.  (R. 325).

When Crews returned to Dr. Graham on January 30, 2008, Crews tested

positive for cocaine.  (R. 583).  Although Crews informed Dr. Graham that the

cocaine use was a "1 time occurrence,"  (R. 583), Dr. Graham informed Crews that

he would discharge her from his clinic if she had another abnormal drug screen.

*Id.*  Notably, two days prior to this visit, Crews alleged during her psychiatric

consultation that she had not used drugs "since last year."  (R. 603).  Moreover, on

January 31, 2008, a court referred Crews to Indian Rivers Mental Health Center

following a possession charge, which Crews claimed she only confessed to in

order to prevent her boyfriend from going to prison.  (R. 594).  In any event,

during her evaluation at Indian Rivers Health Center, Crews stated that "although

she used amphetamines[,] her primary drugs of choice continue to be marijuana

and cocaine."  *Id*.  Furthermore, Crews stated that "she has chronic pain due to

spurs in her back and takes loratabs [sic] some during the week along with the

injections.  She states that she cannot come off of the pain medications."  *Id*.

The next month, on February 23 and 24, 2008, Crews sought treatment from

the DCH emergency department for migraines.  (R. 489, 648).  As it relates to the February 23 visit, the physician noted that Crews lied about visiting the DCH emergency room earlier that same day and obtaining narcotics.  (R. 489).  Crews lied to the physician in order to obtain more narcotics.  *Id*.

On April 15, 2008, Crews visited Dr. Graham alleging increased neck pain, low back and left foot pain.  (R. 586).  Although Crews' physical examination appeared normal, Dr. Graham prescribed Crews Lortab and Robaxin to help alleviate the alleged pain and scheduled Crews to return in three months for medication management.  *Id*.  Dr. Graham also referred Crews to Dr. Brian Claytor  ("Dr. Claytor") for evaluation and possible treatment.  *Id.*

The next day, Dr. Claytor evaluated Crews for chronic neck and left arm pain.  (R. 587).  The examination revealed no objective condition to justify the magnitude of Crews' alleged pain.  *Id*.  According to Dr. Claytor's entries, Crews walked and stood normally without a limp or instability and Crews' x-rays showed the previous fusions at C5-6 and C6-7 and that the plates remained in place.  *Id*. Moreover, although an MRI showed "some residual uncovertebal joint hypertrophy on the left that does resemble the neuroforamen,"  Dr. Claytor did not recommend surgery because the MRI showed a solid fusion at C6-7.  *Id*.

On July 16, 2008, Crews returned to Dr. Graham alleging neck, low back,

and left foot pain.  (R. 588).  Dr. Graham noted that Dr. Claytor did not

recommend surgery, that Crews failed another drug screen on two different

occasions, was currently in drug rehabilitation, and that Crews' drug of choice was

cocaine.  *Id.*  Dr. Graham noted further that Crews' physical examination appeared

normal, except for the low back, left leg, and neck pain as noted in the chart, and

scheduled a transforaminal epidural.  *Id.*

On June 23, 2009, Crews visited Neurologist Hector Caballero ("Dr.

Caballero") alleging headaches, pain and swelling in her legs.  (R. 688).  Crews

relayed doing poorly, that she was diagnosed with four migraines per month, had

difficulty tying her shoes, and that her socks were very tight.  *Id.*  Dr. Caballero

performed an extensive examination that showed Crews in no acute distress,

unremarkable vital signs, no muscle or back pain, or joint stiffness, *Id.*  Dr.

Caballero did note that Crews has hypertension and uncontrolled migraines.  (R.

689).  Crews returned to Dr. Caballero on July 13, 2009, alleging an increased

number of migraines and difficulty sleeping.  (R. 690).  Although Crews again had

an unremarkable examination, Dr. Caballero diagnosed her with chronic daily

headache, episodic migraines, and severe insomnia.  (R. 691).

While it is undeniable that Crews has an extensive medical history, based on

the court's review of the medical file, the record supports the ALJ's finding that

Crews' allegations of pain are not credible for several reasons.  First, no physician ever stated that Crews' pain is disabling.  (R. 261-69, 281-85, 460, 468, 576-86, 688).  Second, although the physicians noted that Crews had reoccurring headaches and pain in her neck, all conveyed that the surgical fusion in Crews' neck functioned properly.  (R. 268-270, 587).  Third, Crews' objective physical examinations never matched her subjective complaints of pain.  (R. 271, 587).  In fact, Crews received unremarkable examinations from multiple physicians over a three year span.  (R. 261, 269, 270, 587).  Fourth, Crews' drug seeking behavior is supported by her admissions to cocaine addiction and lying to a DCH physician on February 23, 2008, about receiving narcotics earlier that day in an attempt to obtain more narcotics.  (R. 489, 583, 594, 603).  Indeed, the record is replete with examples of Crews visiting multiple physicians within a short amount of time and requesting narcotics from each doctor.  (R. 346-49, 352-53, 368-70, 376-86, 416-17, 464-66, 472-75).  In short, while Crews suffers from severe impairments, the record evidence substantiates the ALJ's finding that these impairments, even in combination, are not so severe as to prevent Crews from working.

The ALJ also relied on Crews' daily activities and inconsistent testimony to discredit her pain allegations.  (R. 23).  For example, when Crews filed her application for disability benefits she stated that she stopped working on June 2,

2004, because of the sale of her employer.  (R. 146).  However, Crews told

psychologist Heath Patterson that she stopped working in 2002 due to chronic pain

and depression.  (R. 294).  Moreover, on a July 18, 2007, Physical Activities

Questionnaire, Crews stated that her daily activities consisted of spending thirty

minutes cooking breakfast, a couple of hours doing laundry, thirty minutes

cleaning the kitchen, thirty minutes vacuuming, and resting the remaining six to

ten hours in the day.  (R. 139).  Crews added that she could stand for five minutes,

walk for five minutes, and sit for fifteen minutes, which contradicted her

statements about vacuuming and cooking breakfast for thirty minutes each day.

*Id*.  Accordingly, due to the objective medical records and the contradicting

statements, the ALJ's decision to discredit the intensity of Crews' alleged pain is

supported by substantial evidence.

### 3.    The AJL Did Not Err By Failing to Obtain a Medical Expert's Opinion

Crews contends next that the "ALJ could have developed the record by

obtaining a medical source opinion (MSO) from a medical expert (ME) to review

the entire record with particular regard to the interrelatedness of [Crews'] physical

and mental impairments and the extend of materiality of substance abuse as

warranted."  Doc. 8 at 8.  The court disagrees.  The relevant law states that the

ALJ *may* ask for and consider the opinion of a medical . . . expert

> concerning whether your impairment(s) could reasonably be expected
> to produce your alleged symptoms . . . . [The ALJ] will develop the
> evidence regarding the possibility of a medically determinable mental
> impairment when [he] ha[s] information to suggest such an
> impairment exists, and you allege pain or other symptoms but the
> medical signs and laboratory finding do not substantiate any physical
> impairment(s) capable of producing the pain or other symptoms.

20 C.F.R. § 404.1529 (emphasis added).  Based on this medical record, the ALJ

had no reason to obtain a ME opinion.  Again, Crews' medical records contained

sufficient evidence, and the ALJ considered Crews' entire medical records

beginning in May 2006 and ending in July 2009,  (R. 23), to reach a finding that

Crews is not disabled.  In short, the ALJ had extensive medical records to make

his RFC determination and committed no error by failing to obtain a ME's

opinion.

### B. The ALJ Properly Considered Crews' History of Substance Abuse in Concluding Crews was not Disabled

Crews' final contention is that "the ALJ never expressly found in a

numbered finding or in the body of his decision that [Crews] is disabled or

explained the basis of the disability.  The ALJ found that no Listing including

12.09 is met and made RFC findings impliedly after exclusion of substance abuse,

without any explanation of what [Crews'] RFC would be in the presence of such

abuse or whether all past work would be precluded."  Doc. 8 at 10.  Generally,

"once the Commissioner determines a claimant to be disabled and finds medical

evidence of drug addiction or alcoholism, the Commissioner then 'must determine whether . . . drug addiction or alcoholism is a contributing factor material to the determination of disability.' 20 C.F.R. § 404.1535.  The key factor in determining whether drug addiction or alcoholism is a contributing factor material to the determination of a disability (the 'materiality determination') is whether the claimant would still be found disabled if he stopped using drugs or alcohol." *Doughty v. Apfel,* 245 F.3d 1274, 1279 (11th Cir. 2001) (citing 20 C.F.R. § 404.1535(b)(1)).  Moreover, "the claimant bears the burden of proving that his alcoholism or drug addiction is not a contributing factor material to his disability determination." *Id.* at 1280.

The Commissioner contends that "[a]lthough the ALJ's decision did not explicitly state that [Crews'] drug abuse rendered her disabled, the decision makes clear that the ALJ found that, despite her other impairments, [Crews] would not be disabled if she stopped using drugs." Doc. 11 at 13.  The court agrees.  First, in determining whether Crews' drug addiction renders her disabled, the ALJ stated that "[i]t is important to note that when [Crews] abuses drugs, she would likely have marked difficulties in social functioning and with regard to concentration, persistence or pace. " (R. 21).  Therefore, the fact that the ALJ found that Crews would have marked difficulties in social functioning, concentration, and pace is

Page 22 of  24

enough to establish a finding of disability under 20 C.F.R. pt. 404 subpt P, app. 1.

Next, the ALJ considered whether Crews would be disabled if she stopped using

drugs and found that when Crews "is not abusing drugs, there is no indication that

she has more than mild or moderate difficulties in these domains." (R. 21). In

short, the ALJ found that Crews failed to establish that she is disabled when she is

not abusing drugs. *Id; see also Doughty,* 245 F.3d at 1280 ("[C]laimant bears the

burden of proving that his alcoholism or drug addiction is not a contributing factor

material to his disability determination."). Moreover, because the ALJ determined

that Crews is not disabled when she is not abusing drugs, the ALJ proceeded to

determine Crews' RFC when she is not abusing drugs, (R. 22), and found that

Crews' drug abuse was a contributing factor material to the determination of

disability. The ALJ's finding is consistent with the evidence and, significantly,

the ALJ made adequate findings of disability prior to applying the materiality test.

Accordingly, the ALJ committed no error.

### VI. Conclusion

Based on the foregoing, the court concludes that the ALJ's determination

that Crews is not disabled is supported by substantial evidence, and that the ALJ

applied proper legal standards in reaching this determination. Therefore, the

Commissioner's final decision is **AFFIRMED**. A separate order in accordance

with the memorandum of decision will be entered.

**DONE** the 30th day of July, 2012.

_____
**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE